MARGARET A. MOESER, Chief
Money Laundering, Narcotics and Forfeiture Section
MARY K. BUTLER, Chief, International Unit
MICHAEL B. REDMANN, Deputy Chief, International Unit
STEVEN PARKER, Senior Trial Attorney
Criminal Division
United States Department of Justice
  1400 New York Avenue, N.W. 3rd Floor
  Washington, D.C. 20005
  Telephone: (202) 262-9968
  Email:  Steve.Parker2@usdoj.gov

BILAL A. ESSAYLI
First Assistant United States Attorney
JONATHAN GALATZAN (Cal. Bar No. 190414)
Assistant United States Attorney
Chief, Asset Forfeiture and Recovery Section
  312 North Spring Street, 11th Floor
  Los Angeles, California 90012
  Telephone: (213) 894-2727
  Facsimile: (213) 894-6269
  Email: Jonathan.Galatzan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>REAL PROPERTY LOCATED IN BEVERLY HILLS, CALIFORNIA,<br><br>Defendant. | No. 2:26-cv-04255<br><br>**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***<br><br>[18 U.S.C. § 981(a)(1)(A) and (C)]<br><br>[F.B.I.] |

The United States of America (the "Government") brings this complaint against the above-captioned asset and alleges as follows:

## PERSONS AND ENTITIES

1.    The plaintiff is the United States of America.

2. The defendant in this action is Real Property Located in Beverly Hills, California[1] (the "DEFENDANT ASSET"), more particularly described in Attachment A.

3. The persons and entities known to the United States whose interests may be affected by this action are 945 Foothill Rd LLC and Sodabeh Khoshdaman.

## NATURE OF THE ACTION

4. This is a civil action *in rem* to forfeit a multimillion-dollar mansion located in Beverly Hills, California, involved in and traceable to an international conspiracy to launder the proceeds of a scheme to defraud the United States, to violate Iraqi bribery laws, and to violate the Foreign Corrupt Practices Act. The United States seeks forfeiture of property pursuant to 18 U.S.C. § 981(a)(1)(C) on the ground that it was derived from violations of U.S. law and other specified unlawful activities, and pursuant to 18 U.S.C. § 981(a)(1)(A) on the ground that it is traceable to property involved in one or more money laundering offenses in violation of 18 U.S.C. §§ 1956 and/or 1957.

## JURISDICTION AND VENUE

5. This is a civil forfeiture action brought pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

6. This Court has jurisdiction over civil actions commenced by the United States under 28 U.S.C. § 1345 and over forfeiture actions under 28 U.S.C. § 1355(a).

7. This Court may exercise *in rem* jurisdiction over the defendant pursuant to 18 U.S.C. § 985(c).

8. Venue lies in this district pursuant to 28 U.S.C. § 1355(b)(1) because acts or omissions giving rise to the forfeiture occurred in this district. Venue also lies in this district pursuant to 28 U.S.C. § 1395(b), because the defendant *in rem* is located in this district.

---

[1] Pursuant to L.R. 5.2-1, residential addresses are listed by the city and state only.

2

**RELEVANT INDIVIDUALS AND ENTITIES**

At all times material to this complaint:

9. The Defense Logistics Agency ("DLA") was a support agency within the United States Department of Defense.

10. Contractor 1 was a corporation located in Virginia. Contractor 1 was formed in around 2005 as an IT company and obtained a government IT contract in around 2010. By 2015 Contractor 1 was competing for contracts from DLA to provide fuel and fuel services to the U.S. military in Iraq and elsewhere. Between 2015 and 2023, DLA awarded contracts to Contractor 1 totaling more than $700 million.

11. Mansour Barzani ("Barzani") was a Kurdish Iraqi citizen with a residence in Virginia.

12. Barzani was a senior official of the Peshmerga security forces in Kurdistan; a public official within the meaning of the Iraqi Penal Code; and a foreign official within the meaning of the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-2.

13. The NYJD Trust No. 1 ("NYJD Trust") was a revocable trust settled by Barzani in Virginia in 2010.

14. Trustee 1 was a U.S. citizen residing in Virginia. From 2010 through at least 2021, Trustee 1 was the sole trustee of the NYJD Trust and the signatory on its U.S. bank accounts.

15. 945 Foothill Rd LLC was a Virginia corporation registered on March 8, 2018. 945 Foothill Rd LLC was used to purchase title to the DEFENDANT ASSET on June 1, 2018. Sodabeh Khoshdaman was the beneficial owner of 945 Foothill Rd LLC.

16. Contractor Officer 1 was a U.S. citizen residing in Virginia.

17. Contractor Officer 1 was also an officer and part-owner of Contractor 1.

18. Contractor Officer 2 was a U.S. citizen residing in Maryland.

19. Contractor Officer 2 was also an officer and part-owner of Contractor 1.

20. Co-Conspirator 1 was a dual U.S. and Iraqi citizen residing in Maryland.

21.    Co-Conspirator 1 was also a joint venture partner of Contractor 1.

22.    Fuel Competitor 1 was a company headquartered outside the United States that, among other things, delivered fuel in Iraq and Syria as a subcontractor to prime contractors with DLA.

23.    Trustee Company 1 was a purported logistics company based in Erbil, Iraq, and controlled, at least in part, by Trustee 1.

24.    Trustee Company 2 was a purported security assistance and logistics company based in Erbil, Iraq, and controlled, at least in part, by Trustee 1.

25.    Trustee Company 3 was a purported logistics company based in Erbil, Iraq, and controlled, at least in part, by Trustee 1.

**EVIDENCE SUPPORTING FORFEITURE**

26.    During in and around 2016 through 2020, Contractor 1, Co-Conspirator 1, and others engaged in a corrupt scheme and conspiracy to obtain and retain DLA fuel services contracts and more than $700 million from DLA, and to exclude others from competing for and performing under DLA contracts, by paying Barzani to corruptly provide Contractor 1 exclusive jet fuel supply access to the Erbil International Airport ("EIA") in Erbil, Iraq, and by concealing the scheme from DLA.  Proceeds of the DLA payments that Contractor 1 obtained as a result of the scheme were transferred to Co-Conspirator 1 and then to the NYJD Trust for the benefit of Barzani.

27.    Trustee 1 transferred approximately $30 million of those funds from the NYJD Trust for the purchase of the DEFENDANT ASSET by 945 Foothill Rd LLC in 2018 and the renovation and improvement of the DEFENDANT ASSET in and around 2019-2022.

I.    **THE CORRUPT AND FRAUDULENT SCHEME**

28.    From in and around 2012 through at least September 2016, Fuel Competitor 1 was a major supplier of fuel to DLA in Iraq.

29.    In 2014, an international military coalition led by the United States initiated a campaign named Operation Inherent Resolve against a militant jihadist organization

4

known as the Islamic State of Iraq and Syria.  Operation Inherent Resolve involved extensive operations by United States Department of Defense forces in Iraq and Syria.

30.    DLA provided fuel and other supplies to the United States military at locations in Iraq, Syria, and elsewhere in support of Operation Inherent Resolve.  EIA served as a critical delivery point to receive fuel for use by the United States military in Iraq and Syria and as a meeting location for convoys making forward deliveries on behalf of DLA to other facilities in Iraq and Syria.

31.    EIA was located within the Kurdistan Region of Iraq, where Peshmerga forces provided internal security.  The Peshmerga and their affiliates provided security at EIA by, among other things, manning checkpoints that controlled entry to the facility.

32.    Beginning in or around late 2014, Contractor 1, Co-Conspirator 1, and others sought to obtain contracts and payments from DLA to provide fuel and fuel services to the U.S. military in Iraq and Syria.

33.    In December 2014, Contractor 1 and a company controlled by Co-Conspirator 1 entered a joint venture agreement to provide fuel delivery and other services for the U.S. government in and around Iraq in exchange for a 50/50 split of profits from the performance of U.S. government contracts.  Co-Conspirator 1 committed to provide services including "base operating support, logistics and transportation."

34.    In or around 2015, Fuel Competitor 1 entered into an agreement with Trustee Company 1 to secure exclusive fuel delivery access to EIA for Fuel Competitor 1 and access to a refinery in Kurdistan in exchange for payments of approximately $0.15 - $0.17 per liter to Trustee Company 1.

35.    By at least January 2016, Contractor 1 officers began discussing how to secure EIA access for themselves and to deny access to EIA for competitors, in order to secure increasing DLA fuel service orders and higher fuel prices.

5

36.     On or about January 3, 2016, Contractor Officer 2 emailed others at Contractor 1, including Contractor Officer 1, listing "questions we should get answered . . . during our next trip To Erbil." The questions included, under the heading "Competition," questions about Fuel Competitor 1's logistics and, under the heading "Base Access": "What can be done to ensure [Contractor 1] remains the only company with base access at EIA?"

37.     On or about July 29, 2016, Contractor 1 was awarded its first major DLA contract, No. SPE600-16-D-9518 (the "16-D-9518 Contract"), a three-year fuel supply contract that had a total estimated value of approximately $166,269,945.00. Under the 16-D-9518 Contract, Contractor 1 was required to deliver fuel, including gasoline, diesel, and critical JP8 jet fuel, to various locations in Iraq and Syria.

38.     Between July 2016 and early October 2016, Peshmerga-controlled security forces denied Contractor 1's trucks access to EIA, which was essential to Contractor 1's ability to perform under the 16-D-9518 Contract.

39.     On August 8, 2016, Contractor Officer 1 and Co-Conspirator 1 communicated over WhatsApp messages about how to get Contractor 1 added to "the Erbil access list." In the exchange that followed, Co-Conspirator 1 replied, "I will do my best . . . We need to pay Arbil people. 150k decent [*sic*] five each. . . Can you [pl]ease arrange for the wire transfer today or tomorrow for 75K. I already have the other 75K. To cover the payments for the peshmarga [*sic*]."

40.     On August 12, 2016, Co-Conspirator 1 sent Contractor Officer 1 WhatsApp messages stating, "Jp8 is ready for delivery in Arbil and bashour. . . . The problem we face is the issue that we must pay .25 cents. I am trying to solve the issue. . . . We need to talk about the [Fuel Competitor 1] situation. . . . Today I have more meetings to solve all the pending issues."

41.     On August 15, 2016, Contractor 1 was scheduled to deliver JP8 fuel to EIA but was blocked from accessing the base. Over WhatsApp messages, Contractor Officer

1 told Co-Conspirator 1, "[I]f we don't deliver, it's a failure on our part and we lose the contract.  Right [now] we are looking like a snake without a head to DLA."  Co-Conspirator 1 replied that he was "talking to airport people," specifically a general.

42.    Later that day, Co-Conspirator 1 sent Contractor Officer 1 a draft contract between Contractor 1 and Trustee Company 2, providing that Contractor 1 would pay Trustee Company 2 $0.25 per liter of JP8 jet fuel delivered to EIA and Harir Airfield, also known as Bashur Air Base in Kurdistan.  Co-Conspirator 1 sent Contractor Officer 1 messages including the following: "This will end the drama in arbil.  And bashor.  And [Fuel Competitor 1] will be out.  Never mention my name. . . .  Just say you have jp8 fuel. . . .  This is just to secure the .25 cents.  That is it.  To Kik [*sic*] [Fuel Competitor 1] and any others out."  Contractor Officer 1 emailed the signed contract, copying Co-Conspirator 1, to an email address from which the contract was immediately forwarded to Trustee 1.

43.    Over the next few days, WhatsApp records indicate that Contractor 1 and Co-Conspirator 1 did not receive any assurance that the agreement would be accepted.

44.    On August 21, 2016, Contractor Officer 2 emailed Contractor Officer 1 a draft letter to DLA accusing Barzani of having a corrupt agreement with Fuel Competitor 1 whereby Barzani received $0.25 per liter of jet fuel supplied in the Kurdistan region.  Contractor Officer 1 specifically identified Trustee Company 2 as Barzani's conduit for the corrupt payments.

45.    On August 25, 2016, Contractor Officer 2 emailed the office of a member of the United States Congress stating, "[Fuel Competitor 1] is paying almost 1 million dollars a month directly to members of the ruling Kurdistan Regional Government, in order to buy exclusive access to US Military installations in Kurdistan. Upon information and belief, Mansour Barzani has an agreement with [Fuel Competitor 1] whereby he receives 25 cents (American) per liter for every drop of Jet fuel supplied in

the KRG region."  The email further alleged that payments are made through Trustee Company 2 and Trustee 1.

46.　On August 26, 2016, Trustee 1 emailed Fuel Competitor 1 an "Erbil Proft Sharing Invoice" on Trust Company 1 letterhead.  The body of the email included the following: "On a side note of our loyalty to [Fuel Competitor 1] is that [Contractor 1] and [a Contractor 1 subcontractor] has tried numerous times to speak with us and has offered us .25 a liter only to be rejected and have even sent people to talk to us after being rejected only to be told we are not interested even at .30. Our loyalty and partnership lies with [Fuel Competitor 1] as we have said from the beginning."

47.　On September 12, 2016, Contractor Officer 2 emailed a DLA officer stating that Contractor 1's trucks had been denied access to EIA and elsewhere by "agents acting on behalf of . . . Mansour Barzani."  The email continued, "It is believed that the said person is partnered with [Fuel Competitor 1] and receives compensation for every liter of Jet fuel delivered in KRG by [Fuel Competitor 1]. It is also believed that the said person is given information by [Fuel Competitor 1] that if [Contractor 1] fails to deliver jet fuel in KRG, [Contractor 1] will get terminated by DLA and therefore [Fuel Competitor 1] will be the only company supplying this product to DLA in all of Iraq to which he will be a partner of."

48.　On September 13, 2016, Contractor Officer 2 sent an email to a Contractor 1 consultant, copying Contractor Officer 1, stating that "Barzani has an agreement with [Fuel Competitor 1] whereby he receives 25 cents (American) per liter for every drop of Jet fuel supplied in the KRG region," and that their subcontractor has "learned that the 25 cents requested is not an official Peshmerga fee or an official requirement but something solely mandated by the individual in question, Mansour Barzani."

49.　On September 19, 2016, Contractor Officer 2 replied to follow up inquiries from the office of the U.S. Congressman that Contractor 1 had previously contacted, stating, "We are working through some of the issues."

50.     On the same day, Contractor Officer 2, copying Contractor Officer 1, replied to a consultant who had offered to escalate Contractor 1's concerns within DLA, stating, "We essentially want the DLA to remain flexible with us while we troubleshoot the problem.  I will get with [Contractor Officer 1] this week to determine if we want to escalate further within DLA. I believe for the moment, we want to pursue other channels directly in KRG."

51.     These other channels in KRG, as the facts herein show, were millions of dollars in corrupt payments to General Mansour Barzani, through Trustee 1, in exchange for providing access to EIA for Contractor 1 and blocking access for DLA's other contractors.

52.     On October 2, 2016, Contractor 1 successfully delivered a tanker of JP8 fuel to EIA for the first time.

53.     Through at least 2020, Contractor 1 would continue to deliver jet fuel and other fuels to EIA, while competitors were blocked from accessing EIA.

54.     On October 4, 2016, Co-Conspirator 1 sent a Contractor 1 employee an email stating, "Please find attached the interim agreement we have drawn up until we can meet and iron out a final subcontract with all parties."  The email attached a letter to Contractor 1 styled as an interim agreement between Trustee Company 3 and Contractor 1.  The agreement provided that Trustee Company 3 would be paid $0.25 per liter for services in Kurdistan under the DLA 16-D-9518 Contract.

55.     On October 7, 2016, a Contractor 1 employee emailed Trustee 1 and Co-Conspirator 1 an executed "Consultancy Agreement" between Contractor 1 and Trustee Company 3, providing for payment of "$.25 (USD) per liter of JET A and JP 8 fuel delivered in Kurdistan under the [16-D-9518 Contract]" to Trustee Company 3 for the period of October 1, 2016 through July 31, 2019 (the "Consultancy Agreement").  The statement of work provided as follows: "[Trustee Company 3] shall assist and secure for

9

[Contractor 1] to obtain approval, through a third party, to supply Jet A and JP8 fuel in Kurdistan for the US Military and any other Coalition Forces."

56. On October 10, 2016, Co-Conspirator 1 sent a Contractor 1 employee a draft letter to DLA stating, "Starting October 15, 2016, [Fuel Competitor 1] will not be authorized to deliver any type of fuel in the Kurdistan region and will not have access to any airport bases including Arbil and Bashur."

57. On January 19, 2017, Co-Conspirator 1 sent a Contractor 1 employee a series of messages explaining that Fuel Competitor 1 was complaining to DLA about Contractor 1's corrupt payments in Iraq, and that they therefore needed to be more careful to conceal the scheme: "They are even asking questions [about] how we deliver it. Because [Fuel Competitor 1] looks like told DLA that we are paying the airport. So at this point the friends who helps us must be protected and we can not mentioned Thier [sic] name nor any type of joint activities. This is for their protection and the sake of contract. We don't want the general and his peoe [sic] to have any issue in the USA and Iraq. We want them to make their profit and they will be part of the current agreement. No one will go behind Thier [sic] back."

58. From in and around October 2016 through at least early 2020, Contractor 1 received hundreds of millions of dollars from DLA under the 16-D9518 Contract and paid Barzani approximately $.25 per liter of JP8 delivered to EIA and Bashur in Kurdistan.

59. During the same period, Contractor 1's competitors were blocked from accessing EIA for jet fuel deliveries.

60. During the same period, when Contractor 1's competitors with DLA contracts were unable to make fuel deliveries requiring EIA access, DLA issued one-time-buy contracts to Contractor 1, often at noncompetitive and greatly inflated prices.

61. On April 16, 2020, Contractor Officer 2 messaged another Contractor 1 officer, stating, "Pretty crazy that [Contractor 1] is delivering fuel in Syria and IRaq [sic]

10

for over $10 per gallon.  Can you imagine what [one competitor], [another competitor], and all these companies must be thinking."

## II.   THE USE OF LAUNDERED CRIMINAL PROCEEDS TO PURCHASE AND RENOVATE THE DEFENDANT ASSET

62.   During October 2016 through April 2020, Contractor 1 received more than $594 million in payments from DLA, including more than $458 million invoiced under the 16-D-9518 Contract and millions more from one-time-buy contracts.

63.   Throughout this period, Contractor 1 frequently invoiced DLA for fuel deliveries under the 16-D-9518 Contract and other contracts and received payments from DLA.  Contractor 1 then wired most of those funds to Co-Conspirator 1's bank accounts.

64.   Throughout this period, Contractor Officer 2 frequently emailed Co-Conspirator 1 an Excel sheet that served as a running ledger to provide an accounting showing how the amounts Contractor was wiring to Co-Conspirator 1 were calculated (the "ledgers").

65.   The ledgers show that the amounts wired by Contractor 1 to Co-Conspirator 1 included all of the costs calculated for each fuel delivery, plus half of the profits for delivery, consistent with their joint venture agreement.  Costs paid to Co-Conspirator 1 included costs for fuel, transportation, and storage.

66.   The ledgers showed that costs for deliveries of "EIA Bashur JP8" also included $.25 per liter for "Cost of Base access Administration."

67.   Beginning around July 2017, Co-Conspirator 1 transferred most of the funds he received from Contractor 1 to the NYJD Trust's bank account at Main Street Bank in Virginia.

### Use of Criminal Proceeds to Purchase the DEFENDANT ASSET

68.   From October 11, 2017, through March 28, 2018, DLA made payments to Contractor 1's bank account at Sandy Spring Bank in Maryland, including several payments for fuel deliveries under the 16-D-9518 Contract totaling approximately

11

$23,187,221.48. DLA records show that these fuel deliveries included JP8 fuel deliveries to EIA.

69. During October 2017 through April 2018, Contractor 1 sent approximately $20 million in funds traceable to these 16-D-9518 Contract payments to three accounts held by Co-Conspirator 1 at U.S. banks. The ledgers show that these transfers included all the costs for the fuel deliveries plus half of the profits.

70. Co-Conspirator 1 then transferred the funds to the NYJD Trust's bank account at Main Street Bank in Virginia, as follows:

| Date | Transferred from Contractor 1 to Co-Conspirator 1 | Transferred from Co-Conspirator 1 to NYJD Trust |
|---|---|---|
| 10/27/2017 | $1,430,001.42 | |
| 11/6/2017 | | $1,000,000.00 |
| 11/10/2017 | $2,000,000.00 | |
| 11/10/2017 | | $2,000,000.00 |
| 11/17/2017 | $2,000,000.00 | |
| 11/20/2017 | | $2,000,000.00 |
| 11/24/2017 | $2,000,000.00 | |
| 11/24/2017 | | $2,000,000.00 |
| 12/1/2017 | $4,500,000.00 | |
| 12/1/2017 | | $3,000,000.00 |
| 12/14/2017 | $4,200,000.00 | |
| 2/8/2018 | | $6,000,000.00 |
| 4/6/2018 | $3,868,139.82 | |
| 4/10/2018 | | $4,051,500.00 |
| **Total:** | **$19,998,141.24** | **$20,051,500.00** |

71. During April through June 2018, these funds were further transferred and used to purchase the DEFENDANT ASSET for approximately $20 million, as follows.

72. On April 20, 2018, the NYJD Trust transferred $12,000,000.00 to an escrow company in Los Angeles, to cover part of the purchase price of the DEFENDANT ASSET.

73. On May 8, 2018, 945 Foothill Rd LLC was formed and registered as a Virginia corporation. Soon thereafter an account in the name of 945 Foothill Rd LLC was opened at Main Street Bank, with signatory Sodabeh Khoshdaman.

74. On May 22, 2018, the NYJD Trust purchased an $8,000,000.00 certificate of deposit from Main Street Bank and pledged it as collateral for an $8,000,000.00 loan from the bank.

75. On May 25, 2018, all $8,000,000.00 of the Main Street Bank loan proceeds were transferred to the Main Street Bank account in the name of 945 Foothill Rd LLC. In around January 2019 the $8,000,000.00 certificate of deposit was used to pay off the $8,000,000.00 loan in full.

76. On May 30, 2018, the NYJD Trust account transferred $19,472.66 to the 945 Foothill Rd account at Main Street Bank, and the 945 Foothill Rd account then transferred $8,019,472.66 to the escrow company in Los Angeles to complete the purchase of the DEFENDANT ASSET.

77. On June 1, 2018, title to the DEFENDANT ASSET was transferred to 945 Foothill Rd LLC.

**Use of Criminal Proceeds to Renovate and Improve the DEFENDANT ASSET**

78. In around June 2018, a bank account ending in 8346 was opened at Main Street Bank in the name of Sodabeh Khoshdaman ("Khoshdaman 8346 account").

79. The Khoshdaman 8346 account was used primarily to receive funds from the NYJD Trust account and use those funds to pay a Santa Barbara construction firm to renovate and improve the DEFENDANT ASSET.

80. From in and around June 2018 through April 2020, the Khoshdaman 8346 account received more than $11.6 million from the NYJD Trust account.

13

81.    From in and around June 2018 through at least September 2021, the Khoshdaman 8346 account had no other source of funds besides the NYJD Trust, except for approximately $45,000 in credits consisting mostly of interest deposits and chargebacks for previous debits.

82.    From October 11, 2018, through December 4, 2018, Contractor 1 received additional payments from DLA in a bank account at Bank of America, including several payments for fuel deliveries under the 16-D-9518 Contract totaling approximately $24,371,573.35.  These included payments for deliveries of JP8 fuel to EIA.

83.    During the same period, Contractor 1 sent several wires traceable to these 16-D-9518 Contract payments to an account held by Co-Conspirator 1 at Main Street Bank.  The ledgers show that the funds transferred included all costs for deliveries of JP8 fuel to EIA, including $.25 per liter for "Cost of Base access Administration."

84.    On December 5, 2018, Co-Conspirator 1 made two transfers totaling approximately $22,429,100.00 from his Main Street Bank account to the NYJD Trust account at Main Street Bank.

85.    On January 15, 2019, the NYJD Trust account transferred $6,000,000.00 of those funds to the Khoshdaman 8346 account.

86.    On February 8, 2019, the NYJD Trust account transferred another $3,800,000.00 of funds traceable to the 16-D-9518 Contract payments to the Khoshdaman 8346 account, for a total of $9,800,000.00.

87.    From May 7, 2019, through May 2, 2022, numerous payments drawn from these funds totaling at least $6,125,591.00 were transferred from the Khoshdaman 8346 account directly to a Santa Barbara construction firm as part of a contract of more than $11 million to renovate and make improvements on the DEFENDANT ASSET, including for the construction of a swimming pool and hot tub.

88.    Additionally, on November 30, 2021, $503,651.32 was transferred from the Khoshdaman 8346 account to another account in the name of Sodabeh Khoshdaman at Main Street bank, ending in 6794 ("Khoshdaman 6794 account").  On December 1,

14

2021, the Khoshdaman 6794 account transferred the same amount, $503,651.32, to the Santa Barbara construction firm as payment for work on the renovation and improvement of the DEFENDANT ASSET.

## FIRST CLAIM FOR RELIEF
### (18 U.S.C. § 981(a)(1)(C))

89.	Paragraphs 1 through 88 above are incorporated by reference as if fully set forth herein.

90.	The DEFENDANT ASSET is property that constitutes, and is derived from, proceeds traceable to one or more foreign offenses involving the bribery of a public official, which is a specified unlawful activity under 18 U.S.C. § 1956(c)(7)(B)(iv), and a conspiracy to commit such offenses.

91.	Bribery of a public official is a criminal offense as set forth in Paragraphs 307 and 310, among others, of the Iraqi Penal Code.

92.	The DEFENDANT ASSET is therefore subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM FOR RELIEF
### (18 U.S.C. § 981(a)(1)(C))

93.	Paragraphs 1 through 92 above are incorporated by reference as if fully set forth herein.

94.	The DEFENDANT ASSET is property that constitutes, and is derived from, proceeds traceable to one or more felony violations of the Foreign Corrupt Practices Act (15 U.S.C. § 78dd-2), which is a specified unlawful activity under 18 U.S.C. § 1956(c)(7)(D), and a conspiracy to commit such offenses.

95.	The DEFENDANT ASSET is therefore subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

15

## THIRD CLAIM FOR RELIEF

### (18 U.S.C. § 981(a)(1)(C))

96.    Paragraphs 1 through 95 above are incorporated by reference as if fully set forth herein.

97.    The DEFENDANT ASSET is property that constitutes, and is derived from, proceeds traceable to one or more wire fraud offenses (18 U.S.C. § 1343), which is a specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A), and a conspiracy to commit such offenses.

98.    The DEFENDANT ASSET is therefore subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## FOURTH CLAIM FOR RELIEF

### (18 U.S.C. § 981(a)(1)(A))

99.    Paragraphs 1 through 98 above are incorporated by reference as if fully set forth herein.

100.    The DEFENDANT ASSET is involved in, and is traceable to property involved in, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1957 and a conspiracy to commit such offenses in violation of 18 U.S.C. § 1956(h). Specifically, the DEFENDANT ASSET is involved in and is traceable to property involved in one or more financial transactions, attempted transactions, and a conspiracy to conduct such transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activities, that is: (i) a foreign offense involving the bribery of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) a felony violation of the Foreign Corrupt Practices Act (15 U.S.C. § 78dd-2); and/or (iii) wire fraud (18 U.S.C. § 1343).

101.    The DEFENDANT ASSET is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

## FIFTH CLAIM FOR RELIEF

### (18 U.S.C. § 981(a)(1)(A))

102.   Paragraphs 1 through 101 above are incorporated by reference as if fully set forth herein.

103.   The DEFENDANT ASSET is involved in, and is traceable to property involved in, one or more transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and a conspiracy to commit such offenses in violation of 18 U.S.C. § 1956(h).  Specifically, the DEFENDANT ASSET is involved in and is traceable to property involved in one or more financial transactions, attempted transactions, and a conspiracy to conduct such transactions involving the proceeds of specified unlawful activity, that is: (i) a foreign offense involving the bribery of a public official (18 U.S.C. § 1956(c)(7)(B)(iv)); (ii) a felony violation of the Foreign Corrupt Practices Act (15 U.S.C. § 78dd-2); and/or (iii) wire fraud (18 U.S.C. § 1343); and were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of the specified unlawful activities in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

104.   The DEFENDANT ASSET is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, plaintiff United States of America prays that:

(a)   due process issue to enforce the forfeiture of the DEFENDANT ASSET;

(b)   due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c)   this Court decree forfeiture of the DEFENDANT ASSET to the United States of America for disposition according to law; and

(d)   for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

17

Dated: April 22, 2026

Respectfully submitted,

MARGARET A. MOESER
Chief, Money Laundering, Narcotics and
    Forfeiture Section
Criminal Division
U.S. Department of Justice
MICHAEL B. REDMANN
Deputy Chief, International Unit
STEVEN PARKER
Senior Trial Attorney

*/s/ Jonathan Galatzan*
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture & Recovery Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA

18

## VERIFICATION

I, Stephen Hart, hereby verify and declare under penalty of perjury that I am a Special Agent with the Federal Bureau of Investigation, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are official files and records of the United States, publicly available files and historical information, information supplied to me by other law enforcement officers, experts, and other witnesses, as well as my investigation in this case, together with others, as a Special Agent of the Federal Bureau of Investigation.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of September, 2025, at WASHINGTON, DC.

Stephen Hart
Supervisory Special Agent
Federal Bureau of Investigation

20